# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF KENTUCKY
# SOUTHERN DIVISION
# PIKEVILLE

| | |
|---|---|
| **THOMAS R. BACK,** *Individually and on behalf of all other similarly situated states,* <br><br> **Plaintiff,** <br><br> V. <br><br> **CHESAPEAKE OPERATING, LLC and CHESAPEAKE APPALACHIA, LLC,** <br><br> **Defendant.** | **CIVIL ACTION NO. 7:16-192-KKC** <br><br><br> <u>**OPINION AND ORDER**</u> |

*** *** ***

The defendants move (DE 70) to dismiss the plaintiff's complaint. For the following reasons, the motion will be denied.

**I. Background**

According to the complaint, the plaintiff, Thomas Back, owns an interest in the oil and gas estate of property located in Knott County, Kentucky. (DE 51, Complaint ¶ 2.) He leased that estate to the defendants (collectively, "Chesapeake"), granting Chesapeake the right to produce and sell the oil and gas. In return, Chesapeake agreed to pay royalties to Back.

Pursuant to the written lease agreement between Chesapeake's predecessor in interest and Back's ancestors, Chesapeake's predecessor was required to pay the lessors a royalty for 1/8 of the natural gas extracted from the land at issue at a fixed rate of $0.12/mcf (thousand cubic feet) for as long as the land produced gas. (DE 51, Complaint ¶ 13; DE 54-2, Lease.) However, Back alleges, "Long ago, before Chesapeake acquired

an interest in Mr. Back's natural gas estate, Chesapeake's predecessors determined and agreed to pay Mr. Back or his ancestors not on the basis of the fixed per-mcf rate set forth in the written contract." Instead, Chesapeake's predecessors "determined and agreed" to pay the lessors "1/8 of the price a[t] which Chesapeake sells the gas (typically the market price), less actual and reasonable expenses incurred in making the gas marketable." (DE 51, Complaint ¶ 14.) Back alleges that, under this agreement, Chesapeake was required to pay royalties based on the sales price of gas at the time it is sold. (DE 51, Complaint ¶ 15.)

Back asserts Chesapeake paid him fewer royalties than the parties agreed to. More specifically, Back asserts that, in late 2007, Chesapeake sold a large amount of natural gas (208 billion cubic feet) to affiliates of certain investment banks at a sales price of approximately $1.1 billion or $5.27/mcf. (DE 51, Complaint ¶¶ 16, 17, 18.) Back alleges that the sale consisted of gas from wells located on the property of thousands of lessors, including Back. He alleges that Chesapeake agreed to give the banks scheduled quantities of gas until 2022. (DE 51, Complaint ¶¶ 16, 17.) The parties have referred to this $1.1 billion transaction as a Volumetric Production Payment ("VPP").

Back alleges that, after the sale, Chesapeake calculated the royalties it paid to him and other lessees "as if no such sale had ever occurred." (DE 51, Complaint ¶ 18.) Later, Back alleges, Chesapeake paid him royalties on the gas sold to the banks but calculated the royalties based on a lower sales price than what the banks paid it. (DE 51, Complaint ¶ 19.)

Back also alleges that Chesapeake sent him regular royalty statements that contained intentional and knowing misrepresentations because they "reflect improperly inflated expenses and improperly deflated royalty payments." (DE 51, Complaint ¶ 23.)

Back asserts claims of breach of contract, breach of the implied covenant of good faith and fair dealing, and fraud. In addition, he seeks an accounting from Chesapeake of the manner by which his royalty payments were calculated.

By prior opinion (DE 50), the Court dismissed the claim for breach of the implied covenant of good faith and fair dealing. Chesapeake now moves for dismissal of the remaining claims.

## II. Analysis

### A. Motion to Dismiss for Failure to State a Claim

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), like the one filed by the defendants here, the "factual allegations in the complaint must be regarded as true." *Scheid v. Fanny Farms Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988) (quoting *Windsor v. The Tennessean*, 719 F.2d 155, 158 (6th Cir. 1983)).

Chesapeake argues that Back's breach-of-contract claim must be dismissed for several reasons. First, it argues that the claim must be dismissed because Back does not allege that Chesapeake breached any provision of the original written lease agreement between the parties. Again, the written lease agreement provides that Chesapeake must pay Back the flat royalty rate of 12 cents/mcf. Back does not allege that Chesapeake breached that provision of the lease.

Back argues, however, that the parties "modified" the written lease agreement to require that Chesapeake pay Back "1/8 of the price a[t] which Chesapeake sells the gas

(typically the market price), less actual and reasonable expenses incurred in making the gas marketable." (DE 51, Complaint ¶ 14.) It is this obligation that Back claims that Chesapeake breached.

Second, Chesapeake argues that the breach-of-contract claim must be dismissed because Kentucky law forbids any such "side agreement" from amending a "written, integrated contract[]." (DE 70-1, Mem. at 7.) The lease's integration clause provides, "this instrument embraces the entire understanding and contract between the parties and any agreements or representations verbal or written, made by any person on behalf of either the Lessor or the Lessee not contained in this lease are unauthorized and do not bind the parties." (DE 54-2, Lease.)

"The purpose of an integration clause stating that there are no agreements or understandings between the parties other than those reflected in the written contract is, of course, to prevent either party from relying upon statements or representations made *during negotiations* that were not included in the final agreement." *Coal Res., Inc. v. Gulf & W. Indus., Inc.*, 756 F.2d 443, 447 (6th Cir. 1985) (emphasis added). Thus, in *O'Bryan v. Massey-Ferguson, Inc.*, 413 S.W.2d 891 (Ky. 1966), the case that Chesapeake cites in support of its argument, the court determined that the integration clause at issue there "utterly" forbade the enforcement of agreements that were made *prior* to the written agreement but not incorporated into it. *Id*. at 893.

The Kentucky Supreme Court has, however, explicitly rejected the argument that an integration clause prohibits parties from modifying an agreement *after* they have executed it. *Energy Home, Div. of S. Energy Homes, Inc. v. Peay*, 406 S.W.3d 828, 834 (Ky. 2013). "In general, a 'merger clause' is a contractual provision to the effect that the

4

written terms of the contract may not be varied by *prior agreements* because all such agreements have been merged into the written document." *Id.* (quoting 17A C.J.S. Contracts § 577 (2013)). Such a clause means that the parties to the agreement are not "contractually bound to any *prior* expressions or representations or understandings that may have arisen between them." *Id*. The clause operates to prevent a party from disavowing the written contract by claiming that the true agreement between the parties included other, unwritten terms or conditions." *Id*. But an integration clause "does not prohibit the parties from future agreements to modify or even to rescind the contract." *Id*.

Third, Chesapeake argues that Back's breach-of-contract claim must be dismissed because he has failed to make sufficient allegations in the complaint to state such a claim. Chesapeake argues that Back has not alleged "when the Lease was supposedly modified, by whom, or the manner of modification" and that he has not alleged any consideration for the alleged modification.

Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. *Bell Atlantic Corp. v. Twombly*, 550 U.S.544, 555 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. (internal citations omitted). In order to survive a motion to dismiss, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Id*. The plaintiff must plead "enough facts to state a claim to relief that

is plausible on its face" and to nudge his claim "across the line from conceivable to plausible." *Id*. at 570.

A claim for breach of contract under Kentucky law requires that the plaintiff establish: "1) existence of a contract; 2) breach of that contract; and 3) damages flowing from the breach of contract." *Fifth Third Bank v. Lincoln Fin. Sec. Corp.*, 453 F. App'x 589, 601 (6th Cir.2011) (quoting *Metro Louisville/Jefferson Cnty. Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky.Ct.App.2009)).

Back's amended complaint pleads the existence of a contract. He alleges that Chesapeake's predecessors in interest entered into thousands of written lease agreements with the owners of oil and gas estates, including Back's ancestors. He further alleges that those agreements provided for various methods of determining the amount of royalties to be paid to the landowners. (DE 51, Complaint, ¶ 13.) Back alleges that "long ago," however, the parties "modified" the lease agreements to provide that the lessee would pay all of the landowners the same royalty rate, which was 1/8 of the price at which the lessee sold the gas less expenses. (DE 51, Complaint, ¶ 14.) He further alleges that Chesapeake breached this amended portion of the lease agreement by failing to pay him the royalties due after Chesapeake sold gas to banks pursuant to the 2007 VPP. Finally, he alleges damages consisting of the royalties due.

It is true that the complaint does not state who modified the leases, when they were modified, or how. Nor does it state whether there was any consideration for the modified royalty rate or what that consideration was. Back will have to prove all of these facts at some point in this litigation. Nevertheless, this additional information is not

necessary to simply state a breach-of-contract claim. Nor does Chesapeake need that additional information to formulate a response to the allegations.

Further, the Sixth Circuit's decision in this matter sheds some light on the issue of when and how the lease agreements were modified. That court agreed that any amendment to the lease agreements must be in writing. Unlike this Court, however, the Sixth Circuit determined that the writing requirement was satisfied by two instruments: the royalty statements issued by the lessee that reflected the modified royalty rate and the corresponding royalty checks signed by Back. *Back v. Chesapeake Appalachia, L.L.C.*, 773 F. App'x 294, 296 (6th Cir. 2019).

Fourth, Chesapeake argues that Back's breach-of-contract claim must be dismissed because, even if the royalty provision of the lease has been amended, Back is not entitled to 1/8 of the price that Chesapeake actually sold the gas less expenses. Instead, Chesapeake argues, Back is only entitled to 1/8 of the "market price" less expenses. And Chesapeake argues that the market price cannot be set by one transaction like the VPP.

The Sixth Circuit has determined that the terms of the amended royalty rate are set forth in the royalty statements issued by Chesapeake and the royalty checks signed by Back. The Court is unable to determine from the royalty statements in the record whether the amended royalty rate is based on actual sales prices or the market rate. (DE 42-1, Royalty Statements.)

Finally, Chesapeake argues that the breach-of-contract claim must be dismissed because the VPP did not sell the investment banks gas, which would trigger Chesapeake's obligation to pay Back royalties. Instead, Chesapeake argues that, with the

VPP, it sold the banks its rights to revenue from the gas produced from the wells, which did not trigger any obligation to pay Back royalties.

For this argument, Chesapeake recognizes that Back and his co-lessors have a right to 1/8 (12.5 percent) of the price at which Chesapeake sells the gas (the revenue from the wells). (DE 70-1, Mem. at 13, n.6.) Chesapeake explains that this agreement leaves it with the right to 87.5% of the revenue from the wells. (DE 70-1, Mem. at 13, n.6.) It argues that, with the VPP, it sold to the banks only its 87.5 percent revenue interest in the gas produced from the wells.

In support of this argument, Chesapeake relies on a ruling by the Southern District of New York in *McCall v. Chesapeake Energy Corp.*, 817 F. Supp. 2d 307 (S.D.N.Y. 2011), *aff'd*, 509 F. App'x 62 (2d Cir. 2013). In that case, the plaintiff McCall co-owned a "working interest" in several wells pursuant to a joint operating agreement (JOA) with various entities named as defendants in the action. The court referred to these defendants as the "Chesapeake Defendants."

As working interest owners, McCall and the defendants were joint owners of the oil and gas while they were *in the ground*. *Id*. at 311. Pursuant to the JOA, after the oil and gas were produced from the ground, however, each working interest owner became the owner of its proportionate share of the minerals. *Id*. at 315. The working interest owners were free to dispose of their share of the oil and gas through a variety of means including by selling an "overriding royalty interest" in them. *Id*.

The Chesapeake Defendants entered into ten VPPs with certain banks. Plaintiff McCall asserted that the VPPs conveyed oil and gas *in the ground*. She alleged that, as joint owner of the mineral in the ground, she was entitled to proceeds from the sale. All

8

parties agreed that the critical issue in the case was "whether the McCall Well VPPs sell oil and gas properties in the ground to which all working interest owners have an undivided interest or only Chesapeake's share of the oil and gas properties after they have been produced." *Id*. at 316. The court determined that, by the plain language of the VPPs, the Chesapeake Defendants had sold only their interest in the oil and gas after it was produced from the ground. *Id*. The Second Circuit agreed, finding "[a]s a matter of law, the conveyances from the Chesapeake Defendants to the banks were term overriding royalty interests, which conveyed only an interest in gas produced and not ownership of the unproduced gas in the ground." *McCall v. Chesapeake Energy Corp.*, 509 F. App'x 62, 64 (2nd Cir. 2013).

Chesapeake argues that, pursuant to *McCall*, the Court should interpret the 2007 VPP at issue in this case to sell only Chesapeake's 87.5 percent revenue interest in the oil and gas produced from the wells. A critical problem with this argument is that the Court has not seen the 2007 VPP. As Chesapeake recognizes, in *McCall*, the court made its decision only after it "painstakingly examined the VPP." (DE 70-1, Mem. at 14.) The court also conducted a similar analysis of language of the JOA between the parties. Without reviewing the 2007 VPP, the Court has no basis for ruling that the VPP conveys only Chesapeake's revenue interest in the gas produced from the wells.

Chesapeake also moves to dismiss Back's fraud and accounting claims. Its arguments for dismissing these claims depends upon the Court finding that it has not breached the royalty provision of the lease. As discussed, the Court is unable to make that finding at this point in the litigation.

### B. Motion to Dismiss for Failure to Join Indispensable Party

Next Chesapeake argues that Back's complaint must be dismissed under Federal Rule 12(b)(7) because he failed to join the two parties who co-own Back's 1/8 royalty interest and because he failed to join the current lessee. Chesapeake asserts that these non-parties are "necessary" to this action.

One problem with Chesapeake's argument is that, even if the non-parties are "necessary" to this litigation, that alone does not mean the case must be dismissed. Determining whether a party is necessary to the litigation is simply the first step in ruling on a motion to dismiss for failing to join an indispensable party. *Keweenaw Bay Indian Cmty. v. State*, 11 F.3d 1341, 1345 (6th Cir. 1993). If the Court finds the non-party necessary, then the Court must consider the issues of the Court's jurisdiction over the non-parties and their indispensability. *Id*. Chesapeake does not address the Court's jurisdiction over the non-parties. Instead it argues that "[i]f joinder is impossible," then the Court should find the non-parties indispensable and dismiss the case. (DE 70-1, Mem. at 11.) The Court cannot dismiss a case on a 12(b)(7) motion merely on the possibility that joinder of necessary parties is impossible.

A second problem with Chesapeake's argument is that it has not established that the non-parties are necessary to this action. In ruling on a motion to dismiss for failure to join an indispensable party, "a court may go outside the pleadings and look to extrinsic evidence." *Davis Cos. v. Emerald Casino, Inc.*, 268 F.3d 477, 480 n.4 (7th Cir. 2001). *See also 16th & K Hotel, LP v. Com. Land Title Ins. Co*., 276 F.R.D. 8, 12 (D. D. C. 2011) ("In evaluating the need for the absent person under Rule 12(b)(7), the court must

accept as true the allegations in the complaint, and may also consider extrinsic evidence submitted by the parties.")

Chesapeake submits the affidavit of Chesapeake's in-house counsel who states that Back co-owns the 1/8 royalty interest in the lease with Jimmie A. Back and Elkhorn Hazard Coal Land LLC. Chesapeake refers to these co-owners as the Non-party Lessors. Neither of them is a party to this action. In addition, according to the affidavit, Chesapeake sold its interest in the lease to Core Appalachia Production, LLC, who subsequently transferred its interest in the lease to Diversified Gas & Oil PLC. Diversified is not a party to this action.

> Under Rule 19(a)(1), a party is necessary if:
>
> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
>
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>
> > (i) as a practical matter impair or impede the person's ability to protect the interest or
> >
> > (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Chesapeake argues that courts "routinely" find that all parties to a contract are necessary parties in cases in which the contract is at issue. (DE 70-1, Mem. at 9.) This may be true, but "[t]here is no hard and fast rule. . . that requires all parties to a contract to be joined as parties in a breach of contract suit that is before a federal court sitting in diversity." *Hirschfield v. B'nai B'rith Int'l*, No. 2:09CV1535, 2010 WL 11565250, at *5 (W.D. Pa. Aug. 10, 2010) (citing cases). Chesapeake must show why in this case the Non-party Lessors and the current lessee are necessary parties.

Chesapeake argues that, if the Court were to conclude that "reformation [of the lease] were appropriate, it would be necessary to join the Non-Party Lessors as parties so they could assert their rights with regard to the proposed reformation." (DE 70-1, Mem. at 9.) Chesapeake argues that the Non-party Lessors may not agree with Back that the royalty provision of the lease has been amended. Likewise, Chesapeake argues that the current lessee is a necessary party because Back is attempting "to change the obligations of the existing lessee (Diversified) without including it as a party." (DE 70-1, Mem. at 10.) But Chesapeake does not explain why the Non-party Lessors' or the current lessee's ability to argue in the future that the lease has not been amended would be impaired or impeded if they are not joined in this action. Perhaps Chesapeake's theory is that these parties would be bound by the Court's decision under theories of claim preclusion or issue preclusion. If so, Chesapeake does not argue this, much less establish it.

In a recent similar case, a district court in this circuit rejected the argument that the co-lessors of the plaintiff Bounty Minerals, LLC were necessary parties in an action by Bounty against two Chesapeake entities that the court referred to as the Chesapeake Defendants. *Bounty Minerals, LLC v. Chesapeake Expl., LLC*, No. 5:17CV1695, 2019 WL 7048981, at *8 (N.D. Ohio Dec. 23, 2019). The Court noted that "Bounty's breach of contract claims are based upon the Chesapeake Defendants' manner of calculating oil and gas royalty payments to Bounty pursuant to the royalty provision" of the leases at issue. *Id*. The claims were "specific to Chesapeake's method and manner of calculating royalty payments to Bounty (and not to any other potential co-lessors of the property)." *Id*. "Thus, the Court will be able to accord complete relief as between the parties to this action in the absence of Bounty's co-lessors." *Id*.

Similarly, Back's claims here are specific to the manner by which Chesapeake calculated royalties. Back does not name the current lessee, and he does not assert that the current lessee engaged in any wrongful conduct. Back can obtain complete relief on his claim without the presence of the current lessee.

As to the Non-party Lessors, Back asserts a claim on his own behalf and on behalf of a purported class of other persons entitled to royalties from Chesapeake. If a class is not certified, the Court's decision regarding Back's claim for royalties will affect only Back's claims against Chesapeake. If a class is certified, then Back will either be obligated to adequately represent the interests of his co-lessors or his co-lessors could choose to pursue their own litigation. Either way, proceeding in this action without the co-lessors as named plaintiffs would not seem to impair or impede their ability to protect their own interests in future litigation.

As to whether Chesapeake will face "inconsistent obligations" if the Non-party Lessors are not joined, it is important to distinguish "inconsistent obligations" from "inconsistent adjudications." *Winn-Dixie Stores, Inc. v. Dolgencorp*, LLC, 746 F.3d 1008, 1040 (11th Cir. 2014). "Inconsistent obligations occur when a party is unable to comply with one court's order without breaching another court's order concerning the same incident." *Id*. (quoting *Delgado v. Plaza Las Ams., Inc.*, 139 F.3d 1, 3 (1st Cir.1998)). "Inconsistent adjudications or results, by contrast, occur when a defendant successfully defends a claim in one forum, yet loses on another claim arising from the same incident in another forum." *Id.*

In the *Bounty* case, the Chesapeake defendant argued that it faced no risk of incurring inconsistent obligations because if two courts reached inconsistent decisions

13

about the lease language, "Chesapeake would be able to comply with both decisions because, after all, this is simply a case about money damages." *Bounty*, 2019 WL 7048981, at *9. Here too, even if a different court should reach a different decision about the lease language in a suit by the co-lessors, Chesapeake could comply with both decisions. It may face the possibility of inconsistent adjudications, but not inconsistent obligations.

Based on the arguments and record currently before it, the Court cannot find that the Non-party Lessors or the current lessee are necessary parties to this action.

### III. Conclusion

For all these reasons, the Court hereby ORDERS that Chesapeake's motion to dismiss (DE 70) this action is DENIED.

Dated February 18, 2020

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY